1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH WHITTAKER,

            Plaintiff,

      v.

ALICE DOE, *et al.*,

            Defendants.

CASE NO.  C04-831-MJP

REPORT AND
RECOMMENDATION

INTRODUCTION AND SUMMARY CONCLUSION

      Plaintiff, an inmate at the Stafford Creek Corrections Center, proceeds *pro se* in

this civil rights action brought pursuant to 42 U.S.C. § 1983.  Plaintiff claims that

between 2001 and 2002, while he was an inmate at the King County Jail ("KCJ"), he was

denied adequate and proper medical treatment for his injured leg.  Dkt. # 7 at p. 3.  He

further claims that in 1991, the medical staff at Washington State Penitentiary ("WSP")

improperly diagnosed his injury, which led to several surgeries and eventually led to the

amputation of his leg.  Plaintiff names the following as defendants:  Alice Lobenstein and

Deborah Riehl, former KCJ Health nurses; Craig Nelson, KCJ Facilities Commander; Jim

Report and Recommendation - Page 1

1  Blodgett, former Superintendent of the WSP in Walla Walla, WA; and Dr. Scott Hutson,

2  consulting orthopedic surgeon for WSP.

3       Now before the Court are separate motions for summary judgment filed by the

4  King County defendants and the Washington state defendants.  Dkt. #s 38, 41.  Having

5  considered all materials filed in support of or opposition to these motions, and the

6  remainder of the record, this Court recommends that defendants' motions for summary

7  judgment be GRANTED and this action be DISMISSED with prejudice.

8                                BACKGROUND

9  A.    Procedural Background

10      On March 23, 2005, the King County defendants filed their motion for summary

11  judgment. Dkt. # 38.  The state defendants filed their motion for summary judgment on

12  March 25, 2005.  Dkt. # 41.  On April 8, 2005, plaintiff filed his response to both

13  motions.  Dkt. # 42.  Both the King County defendants and the state defendants filed their

14  responses by  reply on April 13, 2005.  Dkt. #s 43, 44.  On April 21, 2005, plaintiff filed

15  his surreply.  Dkt #s 45-48.

16      On April 24, 2005, the King County defendants requested that the court not

17  consider the surreply because under CR 7(d)(3) Plaintiff was not entitled to file one.

18  Dkt. # 49.  This issue will be addressed in Discussion, Section B.4 below.

19  B.    Undisputed Facts

20      The following facts are not in dispute.  Plaintiff came to the Washington State

21  Penitentiary in August, 1990.  Dkt. # 41-1, p.86 [1] (filed as Ex. 1, Deposition of Kenneth

22  Whittaker)  The first time he experienced a problem with his foot was in August of 1991

23  after participating in a walk-a-thon at WSP.  *Id.*  Plaintiff noticed a blister on his right big

24

25          [1]Page numbers noted are those found on the document and not those assigned by the

26  clerk's office.

Report and Recommendation - Page 2

1 toe the day after the walk-a-thon. *Id.* He was seen the next day by a WSP medical staff

2 member, and near the end of that month, the WSP doctor concluded the toe had an

3 "osteomyelitis infection" and prescribed antibiotics, foot soaks and dressing changes. *Id.*

4 at p.90. Two days after the diagnosis, Plaintiff saw, for the first time, Dr. Hutson, an

5 orthopedic surgeon who visited WSP on a weekly basis. *Id.* Thereafter, Plaintiff saw Dr.

6 Hutson six times between September and November. *Id.* at p. 92. Because the infection

7 was not improving, Plaintiff chose to have the toe amputated on November 20, 1991. *Id.*

8 at 95. Plaintiff's wound healed normally. *Id.* at p. 100.

9    Nine months later, Plaintiff developed another blister (*Id.* at p. 101) and after

10 another course of conservative treatment with antibiotics, Dr. Hutson again recommended

11 amputation of the infected second toe. *Id.* at pp. 104-05. Plaintiff wanted a second

12 opinion and was, therefore, transferred to the Monroe Correctional Complex ("MCC").

13 After the transfer, Plaintiff never saw Dr. Hutson again. *Id.* at p. 105.

14    At MCC, plaintiff was seen by Dr. Douglas Smith, an orthopedic surgeon from

15 Harborview Medical Center in Seattle, who explained that as a result of his condition,

16 known as a neuropathic foot, the amputation of his toe would not totally solve the

17 problem because the main reason for the blisters is a loss of sensation in the foot, which

18 cannot be replaced. Dkt. # 41-2*,* p. 32 (filed as Exhibit 1,Deposition of Douglas Smith,

19 M.D.). This loss of sensation in the foot or neuropathic foot came as a result of a severe

20 leg fracture that occurred in 1989 and resulted in a lot of scarring and skin that did not

21 have normal nerve sensation due to nerve damage. Dkt. # 38-2, pp.7-9, 13-14. A chart

22 note from August, 1993, reveals that Dr. Smith informed Plaintiff that even after the

23 amputation of his toe, he would most likely develop further pressure points requiring

24 more amputations and "also told him it is my opinion he will somewhere in the next

25 several years probably lose his foot." Dkt. # 38-2, pp. 11-12. The chart note also states

26

Report and Recommendation - Page 3

1   that plaintiff "is aware of this but he does not want a below-the-knee amputation at this

2   time.  He would just like to address the local problems."  *Id.*

3       Thereafter, Plaintiff had multiple amputations so that he had no toes on his right

4   foot after 1994.  Dkt. #38-2, p.15.  Plaintiff concedes that he underwent those

5   amputations despite having tried all conservative measures to avoid those surgeries.

6   Dkt. # 38- 4, pp. 8-10.  Between 1993 and 2002, Plaintiff continued to receive treatment

7   for his foot condition off and on by Dr. Smith.  Dkt. # 38-2, p. 8.

8       In January 2002, Plaintiff decided he would undergo a below the knee amputation

9   of his right leg because of the problems he was suffering Dkt. # 38-2 p. 15.  Dr. Smith

10   regarded the surgery as plaintiff's wisest option.  *Id.*  at p.11.  Once Plaintiff was moved

11   to the Department of Corrections, he had the below the knee amputation.  Dkt. # 38.

12       Between February 24, 2001, and February 6, 2002, Plaintiff was incarcerated in

13   the KCJ.  Dkt. # 38-3. pp.8-9.  While in KCJ, plaintiff received regular care from Jail

14   Health Services for poorly controlled hypertension and his neuropathic foot, among other

15   conditions.  Dkt. # 39. p.2 ( Declaration of Alice Lobenstein), Dkt. # 40. p.2

16   ( Declaration of Deborah Riehl)  His primary care provider was Advanced Registered

17   Nurse Practitioner Pamela Williams.  Dkt. # 39, p.3.  Nursing Supervisor Alice

18   Lobenstein dispensed pills to Plaintiff at times, and supervised other nurses who

19   personally provided him care.  *Id.*  Another jail nurse, Deborah Riehl, also assessed

20   Plaintiff and changed the dressings on his foot on a number of occasions.  Dkt. # 40,

21    pp. 2-3.

22       Between October 18, 2001, and November 8, 2001, Plaintiff was housed in

23   Administrative Segregation on the 11th floor of the jail.  *Id.*  Generally, wheelchairs and

24   crutches are not permitted in the segregation cells of the jail for security reasons.  *Id.*

25   Plaintiff, however, requested a wheelchair in his cell and Nurse Lobenstein denied this

26

Report and Recommendation - Page 4

1  request.  *Id.*  at p. 4.

2  <u>DISCUSSION</u>

3  A.      State Defendants

4   The state defendants argue that 1)  Plaintiff has stated state law claims only, and

5  as such, this Court lacks jurisdiction[2]; and 2)  the claims against the state defendants are

6  barred by the statute of limitations.  Dkt. # 41.  Because the statute of limitations issue is

7  dispositive against state defendants, the Court will only address its applicability.

8   Plaintiff has alleged that the state defendant Dr. Scott Hutson, the consulting

9  orthopedic surgeon for WSP, mis-diagnosed his condition, which ultimately resulted in

10  the amputation of his leg.  Dkt. # s 7, 18.  He also alleges that Jim Blodgett, former

11  Superintendent of WSP, failed to adequately supervise his subordinates.  *Id.*

12   While Title 42 U.S.C. § 1983 contains no specific statute of limitations, federal

13  courts will apply state statute of limitations for personal injury actions in § 1983 suits.

14  *See Wilson v. Garcia*, 471 U.S. 261, 276 (1985); *Johnson v. California*, 207 F.3d 650,

15  653 (9th Cir. 2002) (per curiam).  Germane, however, "[f]ederal law determines when a

16  cause of action accrues and the statute of limitations begins to run for a § 1983 claim."

17  *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991) (citing *Norco*

18  *Construction, Inc. v. King County*, 801 F.2d 1143, 1145 (9th Cir.1986)).  "A federal claim

19  accrues when the plaintiff knows or has reason to know of the injury which is the basis of

20  the action."  *Id.*

21   In Washington, claims relating to damages occurring as a result of health care is

22  governed by Wash. Rev. Code. § 4.16.350(3), which states in part:

23

24   [2] In a footnote, State Defendants state that "[s]hould the Court find a federal claim is
stated by Plaintiff, it would necessarily be an Eighth Amendment claim of deliberate indifference
to a serious medical need[;] . . . King County Co-Defendants have addressed the legal sufficiency

25  to state such a claim at pp. 9-10 of their Motion for Summary Judgment [and] . . . State

26  Defendants adopt this portion of King County's argument.  Dkt. # 41.

Report and Recommendation - Page 5

1

2

3

4
> Any civil action for damages for injury occurring as a result of
> health care which is provided after June 25, 1976 . . . based upon
> alleged professional negligence shall be commenced within *three
> years* of the act or omission alleged to have caused the injury or
> condition, or one year of the time the patient or his representative
> discovered or reasonably should have discovered that the injury or
> condition was caused by said act or omission, whichever period
> expires later[.][3]   (Emphasis added).

5

6
Here, the alleged mis-diagnosis of the blister on Plaintiff's big toe occurred between

7
September and November, 1991, and the first amputation occurred in November, 1991.

8
Thus, the last time-period for filing Plaintiff's claim against state defendants was three

9
years from that date, by November, 1994.

10
   Plaintiff argues that because his injuries are "ongoing, repetitious, and

11
continuous," the statute of limitations does not start to run until the "continuing wrong"

12
ends. Dkt. # 42.[4]  *See Outman v. United States*, 890 F.2d 1050, 1053 (9th Cir. 1989).  The

13
doctrine of "continuing wrong" holds that where a tort that involves a continuing injury,

14
the limitation period begins to run at the time the tortuous conduct ceases.  *Page v.*

15
*United States*, 729 F.2d 818, 821 (D.C. Cir. 1984).  However, this doctrine is not

16
available to toll the statute of limitations in a medical malpractice case where Plaintiff

17
knows of the acts constituting negligence.  *See Outman*, 890 F.2d at 1052-53 (9th Cir.

18
1989)(citing *Ashley v. United States*, 413 F.3d 490, 492 (9th Cir. 1969)).  Here, the claim

19
against Dr. Hutson is in effect a medical malpractice claim, and as such, the continuing

20

21

22

23

24
   [3] Defendants erroneously argue that "[s]etting aside the issue whether Plaintiff should have
reasonably discovered Dr. Hutson's alleged act or omission as the cause of his damages at the time,
Plaintiff would have had to file his complaint, at the latest, by November 1999 to comply with Wash. Rev.
Code § 4.16.350." In making their argument, defendants rely on a portion of Wash. Rev. Code §
4.16.350(3) ("except that in no event shall an action be commenced more than eight years after said act or
omission"), which has been declared unconstitutional by *DeYoung v. Providence Medical Center*, 960 P.2d
919 (Wash. 1998).

25

26
   [4] Plaintiff also argues there exists a conspiracy between Dr. Hutson and Dr. Smith and the
statute of limitations begins to run from the occurrence of the last overt act resulting in damage to
the Plaintiff.  This is a bald assertion without support in the record, thus it is without merit.

Report and Recommendation - Page 6

1   wrong doctrine does not apply.  As a matter of law, this argument is without merit and

2   Plaintiff's claims against state defendants shall be dismissed on statute of limitations

3   grounds.

4   B.      King County Defendants

5          These Defendants seek summary judgment and dismissal on the grounds that the

6   Plaintiff did not amend his complaint to name the nurses and jail operations commander,

7   in additional to challenging the substantive claims of Eight Amendment violations.

8          1.      Standard of Review for Matters on Summary Judgment

9          Summary judgment is appropriate if there is no genuine issue of material fact and

10  the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56©).

11  An issue of material fact is one that affects the outcome of the case and requires a trial to

12  resolve differing versions of the truth.  *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-06

13  (9th Cir. 1982).  In deciding the motion, the court views the evidence in the light most

14  favorable to the nonmoving party, and draws all reasonable inferences in that party's

15  favor.  *Poller v. Columbia Broadcasting System, Inc.*, 369 U.S. 464, 473 (1962); *T.W.*

16  *Elec. Serv, Inc. v. Pacific Elec. Contractors Assn.*, 809 F.2d 626, 630-31 (9th Cir. 1987).

17         In opposing a motion for summary judgment, the nonmoving party cannot simply

18  rely on mere allegations or unsupported assertions.  *See* Fed. R. Civ. P. 56(e).  "The mere

19  existence of a scintilla of evidence in support of the non-moving party's position is not

20  sufficient."  *Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

21  Instead, the nonmoving party must by affidavit or by the "depositions, answers to

22  interrogatories, and admissions on file," designate "specific facts showing that there is a

23  genuine issue of material fact for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

24  (1986); Fed. R. Civ. P. 56(e).  In other words, "summary judgment should be granted

25  where the nonmoving party fails to offer evidence from which a reasonable jury could

26

Report and Recommendation - Page 7

1   return a verdict in its favor." *Triton Energy Corp.*, 68 F.3d at 1221.

2          2.  Eighth Amendment Denial of Medical Needs

3          Plaintiff asserts that the inadequate medical care provided by the King County

4   defendants is an Eighth Amendment violation. Dkt. # 7; Dkt. # 18.  Specifically, Plaintiff

5   argues that. 1)  Nurse Deborah Riehl refused to change his dressings on three different

6   occasions, thus causing him to walk on his foot with the "open infected wounds;"

7   2)  Nurse Alice Lobenstein denied him access to a wheelchair while he was in

8   administrative segregation[5], thus forcing him to bear weight on his foot, and did not allow

9   him to come down to medical units to take baths; 3)  Craig Nelson, former KCJ

10  Operations Commander, failed to adequately train and supervise the medical staff at KCJ

11  and failed to take action regarding the alleged inadequate care provided to plaintiff, even

12  though he knew about the problem.  *Id.*

13          The Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), established the

14  rule that in order to state a cognizable claim under the Eighth Amendment, a prisoner

15  must allege acts or omissions which show "deliberate indifference" to his serious medical

16  needs.  This indifference must be more than mere negligence; it must involve the

17  "unnecessary and wanton infliction of pain." *Id*. at 105.  Isolated occurrences of neglect

18  do not amount to deliberate indifference to serious medical needs.  *See Toussaint v.*

19  *McCarthy*, 801 F.2d 1080, 1111 (9th Cir. 1986), *cert*. *denied*, 107 S. Ct. 2462 (1987).

20  Even gross negligence is insufficient to establish deliberate indifference.  *See Wood v.*

21  *Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).  A difference of opinion between the

22  physician and the prisoner concerning the appropriate course of treatment does *not*

23  constitute deliberate indifference.  *See Jackson v. McIntoch*, 90 F.3d 330, 332 (9th Cir.

24

25
          [5] Plaintiff does not take issue with the propriety of the decision to send him to Administrative
26  Segregation.

Report and Recommendation - Page 8

1   1996). (Emphasis added.)

2          King County argues for summary judgment on the ground that Plaintiff cannot

3   show that its actions were deliberately indifferent, that being "purposeful and

4   substantial," citing to *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514 (9th Cir. 1999).

5   They argue that *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175 (9th Cir. 2002),

6   requires that the prisoner show the "official knows of and disregards an excessive risk to

7   inmate health and safety."

8          Responding to the most serious allegation that the county's "negligence" resulted

9   in the Plaintiff's later foot amputation, defendants rely upon medical opinions to explain

10  the reasons for the amputation.  They argue that "Plaintiff's amputation came as a result

11  of his neuropathic foot condition and nothing they could have done would have prevented

12  this amputation." Dkt. # 38.  Moreover, the undisputed records show that the county

13  knew the Plaintiff's condition and that because of it "somewhere in the next several years

14  [Mr. Whittaker will] lose his foot" by way of a below the knee amputation.

15   *See* Dkt. # 38-2.  King County defendants also note that prior to his arrival at KCJ,

16  plaintiff had undergone multiple amputations on his right foot, so that he had no toes on

17  the foot after 1994 despite having tried all conservative measures to avoid the surgeries,

18  including not bearing weight on the foot, staying in a wheelchair, foot soaks, and regular

19  dressing changes.  *Id*.

20         Plaintiff believes that there is a genuine issue of material fact regarding Dr.

21  Smith's testimony.  Plaintiff argues that Dr. Smith *lied* during the deposition as evidenced

22  by his statement that "the chronic problem is 'actually not -- *is* related' to that [1989]

23  injury."  Plaintiff asserts this statement is inconsistent with Dr. Smith's opinion that

24  plaintiff's neuro-pathic foot developed as a result of the 1989 leg fracture.

25  See Dkt. # 38-4, p. 106.  However, Smith's deposition reveals that Dr. Smith, briefly mis-

26

Report and Recommendation - Page 9

1   spoke and corrected himself instantly.  This conclusion is supported by the medical

2   record which Smith relied upon.  The Court, therefore, finds that this alleged discrepancy

3   does not constitute a genuine issue of material fact.

4        Plaintiff also alleged that two nurses administered his care with deliberate

5   indifference:  1) Nurse Riehl refused to change his dressing, in her deposition, and 2)

6   Nurse Lobenstein refused him the use of a wheelchair inside his cell.  Nurse Riehl,

7   relying upon Plaintiff's medical care records, asserts that Plaintiff received daily dressing

8   changes either by her or other nurses.  *See* Dkt. # 40, p. 4.  Moreover, she states that she

9   has no memory of having declined to personally change Plaintiff's foot dressing.  *See Id.*

10  at p.3.  She notes, however, that if she had, it would have been either because plaintiff

11  was not scheduled for the dressing change at the time, it was not within her duties at the

12  time, or higher patient priorities were consuming her time at that moment.  *Id.*  Plaintiff

13  admits that on each of the three occasions that Nurse Riehl declined to change his

14  dressing, she told him another nurse would change them later.  In fact, the record shows

15  he received dressing changes the same day.  Dkt. # 38-2, pp 3-4.  Only on one occasion

16  did he have to wait 24 hours.  Dkt. # 38-3.  Inasmuch as he receive daily treatment, these

17  facts do not  present a genuine issue of material fact amounting to "deliberate

18  indifference."

19       Secondly, in response to Plaintiff's allegation that while in administrative

20  segregation Nurse Lobenstein denied him access to a wheelchair and did not allow him to

21  take baths, Nurse Lobenstein explains that she denied Plaintiff's request to a wheelchair

22  because she felt that given his ability to fully use his left leg and the small size of his cell,

23  he would not need a wheelchair to get around.  *See* Dkt. # 39, p. 3-4.  Also, Nurse

24  Lobenstein granted Plaintiff access to a wheelchair for all movement outside his cell and

25  he had a shower stall within six feet of his segregation cell with a shower seat so as not to

26

Report and Recommendation - Page 10

1   bear any weight on his foot when he showered. *Id.* at pp. 4-5.  Plaintiff disputes this by

2   saying that he had difficulty getting to the cell entrance to get his food and medicine,

3   which were left at the door of the cell.  Dkt. # 42.  Plaintiff does not dispute, however,

4   that he was told not to place weight on his right foot and moreover, that Nurse Lobenstein

5   lacked any knowledge of Plaintiff's difficulties within the cell.  *Id.*  Taking the evidence

6   in the light most favorable to the non-moving party, Plaintiff fails to present any genuine

7   issue of material fact regarding Nurse Lobenstein's actions within the meaning and

8   requirements of *Toussaint.*

9       With respect to Jail Operations Commander Nelson, Plaintiff states in his

10  deposition that he does not know whether Commander Nelson is responsible for the

11  training and supervising of defendants Riehl and Lobenstein or whether he was made

12  aware of Plaintiff's alleged problems.  Dkt. # 38-3, pp. 3-4.  Later in his pleadings,

13  Plaintiff argues that Commander Nelson was made aware of his issues with Nurses

14  Lobenstein and Riehl because Plaintiff had filed medical grievances against them.  Dkt. #

15  42.  Plaintiff provides no support for this assertion, thus, summary judgment on this claim

16  is warranted.

17      3.   Qualified Immunity

18      Defendants contend that even if a constitutional violation is found, they are entitled

19  to qualified immunity from suit.  Summary judgment on the grounds of qualified immunity

20  when performing discretionary functions is permitted unless such conduct violates a

21  clearly established constitutional or statutory right of which a reasonable person would

22  have known. *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001).  Here, there

23  is no support for Plaintiff's claim of constitutional violations, hence the Court need not

24  address the issue of qualified immunity.

25      4.   Other Arguments

26      First, Plaintiff alludes to an equal protection claim in arguing that "disparate

Report and Recommendation - Page 11

1  treatment occurs when jail staff/prison staff and personnel treat some inmates less

2  favorably than others on account of race, religion, sex or creed," and that "the constitution

3  forbids 'sophisticated' as well as simple minded modes of discrimination."  Dkt. # 42.

4  This issue is not properly before the Court as it was not contained in the complaint.

5  Second, Plaintiff argues that he need not plead any facts in his complaint pursuant to

6  FRCP 8(a).  Dkt. # 42.  Third, Plaintiff, in his surreply, revisits the issue of the ADA and

7  argues that the his current facility, Stafford Correctional Center, has not provided him with

8  adequate rehabilitation to help in using his new prosthetic leg.  Defendants argue that all

9  of these issues are not properly before this Court not having been contained in the

10  complaint.  Plaintiff responds by asserting that the Court must construe his pleadings

11  liberally because he is a *pro se* litigant and unfamiliar with pleading requirements.

12  However, liberal construction of pleadings does not mean that a party can bring any new

13  claim at any time during proceedings.  Additionally, the Stafford Creek Correctional

14  Center, where Plaintiff is currently incarcerated and against whom he is claiming

15  inadequate rehabilitation, is not a party in this suit.

### CONCLUSION

17      For the reasons set forth above, this Court recommends that Defendants' motions

18  for summary judgment be GRANTED and that Plaintiff's claims against Defendants be

19  dismissed with prejudice.  A proposed order accompanies this Report and

20  Recommendation.

21      DATED this 17th day of October, 2005.

22

23

24                                      Monica J. Benton
                                        United States Magistrate Judge

25

26

Report and Recommendation - Page 12